Hunt, Oh. J. (dissenting).
The negligence charged upon ,the .defendants, which I shall discuss, is based: first, upon the omission to station a flagman at the crossing in question; and, second, upon the failure to ring a bell, at the front of the advancing train. The jury found, that the defendants were guilty of negligence, in these respects. The statute requires, that a bell, situated on the engine, be rung at a distance of eighty rods from every crossing, and that such ringing be continued, until the engine shall have passed the crossing, or that a steam whistle shall be sounded for the same distance. (Laws, 1854, § 7; 3 Statutes at Large, p. 643.) In the present case, the engine was at the rear of the train, which was being backed in a westerly direction, and there were six cars in the train, making a distance of one hundred and sixty or one hundred and eighty feet between the car, which struck <- the sleigh of the deceased, and the engine which propelled the cars, and which also bore the bell. The judge charged that this bell must be rung under circumstances likely to give notice to passers by; that, although the statute might be satisfied, by having it rung in its proper place on the car, and while passing a crossing, yet that they were to determine, whether it was sufficiently rung in the present case. In my *53 opinion, tMs was a charge quite favorable to the defendants. This statute is to be construed with reference to the ordinary equipment and management of railroads in use throughout the country. Thus, the statute does not describe the bell which must thus be rung, or the whistle thus to be blown jSTo one, however, would claim, that the duty of the company would be satisfied by the use of a penny whistle, or by the ringing upon the engine of a pocket bell, or the use of a bell so muffled and enclosed, that its sound was destroyed. This would satisfy the literal provision of the statute, but it would not be a compliance. The statute means such bells and such whistles, as are.ordinarily used upon engines, and as would ordinarily give notice of the approaching train, at a distance of eighty rods. So, in regard to the location of the bell. The engine is ordinarily placed in the front of the train, and precedes all the other portions of it. A train is regularly and properly made up in that form. An engine, at the rear of a train, is only so placed, for the temporary purpose of shifting cars from one position to another, or some like exceptional purpose. In requiring that the bell upon the engine should be rung, at a distance of eighty rods before reaching a cross-' ing, the legislature intended that the first portion of the advancing train should bear the bell, and that a warning, of the approaching danger should be given by its foremost member. Freight trains, or trains of empty cars may often be seen, stretching over a distance of half or three-quarters of a mile. How idle would be a provision for the ringing, of a bell upon an engine at the' rear of such a train! Three-fourths of the cars might have passed over the crossing, thus-intended to be protected, before the bell would be required to be rung! Such a construction would be absurd. In my opinion, no error can be urged by the defendants, from the manner in which this point was submitted to the jury.
The question of the necessity of a flagman, at this station, was presented in a great variety of forms. The point in dispute is folly raised by that portion of the charge, in which the judge leaves it to the jury to say, under all the circum *54 stances, whether a flagman at this station was or was not required, as a measure of reasonable precaution on the part of the defendants. The statute is silent upon this point, as it is upon the most of the duties incumbent upon those, who manage and run a railroad train. The imposition of a particular duty, like that of ringing a bell or sounding a whistle, has never been construed, as comprising all the obligations resting upon a railroad company. Independently of any statute, it is the duty of such a corporation to use and manage its road and machinery in a careful and vigilant manner. The terrible power for evil, of the means they employ, imposes upon them the obligation of protecting others from such effects, by a care and attention proportioned to the danger incurred. (Brown v. The New York Central Railroad, 34 N. Y. R., 404; Bradley v. Boston Co., 2 Cushing R., 539.) See the English cases, post. A train of cars may safely run, at fifty miles per horn, over the open fields of the country, while the same speed, through the crowded streets of a city, would be gross negligence. It would be an unnecessary attention to station a flagman at every country crossing; but I am not prepared to say, that it is not a prudent precaution, which may reasonably be required, when crossing a crowded thoroughfare. I take the principle to be, without qualification, that in the soundness of their road and machinery, and in its management, great care and attention are required of the corporation. Whether, in a given "case, it has equaled, or has fallen short of these requirements, is emphatically for the decision of the jury. The number of trains passing over the road, the amount of foot' travel and of carriage travel, the facility or the difficulty of seeing trains, as they approach, and the rate of speed of the trains, all tell upon the question of the degree of danger. So, in determining, whether the necessary attention has been given to guard against accident, the jury are "to look at all the means of warning, that are or may be given. The bell, the whistle, a diminished speed, a head light at night, the presence of a flagman, are important precautions.
*55 There has been no authoritative adjudication in this court, upon the precise point under consideration, but upon principle, I believe the ruling of the judge to have been correct. This means of caution and warning, like all others, may be safely intrusted to the custody of the jury. Three cases have recently been decided in the English courts, which throw some light upon this point. In Bilbee v. The London B. and S. C. Railway Company (18 Com. Bench N. S., p. 584), the subject was brought to the consideration of the Court of Common Pleas, and the head note is thus given: “A railway crossed, on a level, a public carriage and footway, at a spot which, from the fact of there being a considerable curve in the line, and a bridge near, trains coming in one direction were not seen until very close, was particularly dangerous.* There were gates across the carriageway, which were kept locked, but the footway was protected only by a swing gate, :n either side, no person being there to caution people passing. The plaintiff, while using the footway, was knocked down by a passing train and injured. Held, that it was properly left to the jury to say, whether or not the company had been guilty of negligence.” On the trial, the chief justice held, that the statutes on the subject of gateways, and the persons to be placed in charge of them, applied to public carriageways only, and not to crossings for the use of foot passengers. He left it to the jury to say, whether the defendants had been guilty of negligence, and, as I understand it, upon the general principles of law applicable to the case. The jury found a verdict for the plaintiff, and a motion was made- to set aside the same, and to enter a verdict for the defendants, on the grounds, that the plaintiff did not establish his case; that there was no evidence of any neglect of duty, or default by the defendants; that there was no statutable or other duty, to keep a man at the foot crossing *56 and that the accident arose from the plaintiff’s own deafness and want of caution. In denying this motion, Ch. J. Eble said: “ I do not mean to lay it down, as a rule, that they are bound to place guards, where a footway crosses the line on a level, or to interfere, in any way, with any statutory duties or obligations of railway companies. The ground, on which I decide in favor of the plaintiff, on this occasion, is, that the great degree of risk, incurred by persons exercising their public rights, in this particular spot, owing to the large number of trains passing daily, the sharpness of the curve, and the obstruction of the view caused thereby, and by-the adjacent bridge, should have induced the company to exercise' more vigilance. Under all the circumstances, I am unable to say, that the judge was bound to nonsuit the plaintiff.” This was the principle decided; that, independently of the statute obligation, and dependent upon the particular facts of the case, which showed the crossing to be a dangerous one to foot passengers, it was the duty of the company to exercise more vigilance, than in other cases, for their protection; and the particular vigilance there required, and for the absence of which, they are held liable, was a guard, to caution those who approached, of the danger of the crossing. This case was decided in May, 1865.
In Stapley v. The London B. and S. C. R. W. Company, (1 Law Report, Court of Exchequer, p. 21), decided in November of the same year, the facts were as follows: On the third of January, 1865, the deceased was returning to the Portslade station, by a road, whieh led him to the level crossing by the north side. When he reached the station, the Brighton express, which did not stop at Portslade, was a few minutes over due. The gates, on the side, by which the deceased approached, were partly open. Half an hour before the accident, they had been seen closed. No gate keeper was there, nor was any one on the platform, although an official was generally placed upon the platform, when a train was expected to pass through. The absence was accounted for, by the temporary illness of the official. On arriving at the *57 crossing, the deceased walked on to the line, either through the open gate or the turnstile. "When he got to a space between the up and down lines, he was seen by a porter, walking with his head bent towards the ground, in the direction of the station platform,, and not directly across towards the gates on the other side. The porter shouted to him to stop, but he continued advancing, and the next instant was knocked down by the Brighton express. No whistle was sounded, until he was struck. The deceased was slightly deaf, but not so much, as to prevent his hearing a loud sound. He was accustomed to the road, and might be deemed to be aware of the times of running the various trains. The judge left it to the jury to say, whether the accident resulted from a want of care, which the defendants were bound to take for the safety of the public, or from the carelessness of the deceased himself. The jury found for the plaintiff. A motion was made to set aside the verdict, upon the ground, that there was no negligence on the part of the company; and, also, that the deceased was himself guilty of negligence, which contributed to the result. The motion was denied. The court held, that the fact of the gate being open was an invitation to pass over the line; that being so left, with no guard present to caution passengers, and a train over due, there was evidence of negligence on the part of the company to go to the jury. The same circumstances, it was held, relieved the deceased from the charge of contributing negligence. If these English cases were correctly decided, and I am of the opinion that they were, they are decisive of the present case, and justify its submission to the jury, both upon the point of the defendants’ negligence and of the plaintiffs’ freedom from negligence. They clearly establish the proposition, that, although there be no statutory obligation requiring it, the question may be submitted to the jury, in a particular case, whether the condition of the thoroughfare, the business by rail, the frequency of crossing by carnage and foot travel, the difficulty or facility of observation, the former attendance of a guard, do not, in the exercise of proper *58 care and attention, require the presence of a guard at such crossing, to warn travelers of an approaching train.
In Stubley v. The London and N. W. Railway Company (p. 13, same vol.), the principle is thus laid down, in the head note: “ There is no general duty on railway companies t<y place watchmen, at public footways, crossing the railway on a level, but it depends upon the circumstances of each case, whether the omission of such a precaution amounts to negligence, on the part of the company. In this case, it was held, by the same judges deciding the case of Stapley, that the facts did not warrant a finding for the plaintiff, and a nonsuit was accordingly ordered.
The defendants, in the present case, requested the court to charge the jury, that the plaintiff could not recover, unless the death was caused solely by the wrongful act or neglect of the defendants or their agents. The court declined so to charge, but did charge, “ that the death must be caused by' the wrongful act, neglect or default of the defendants. The death must be caused essentially by that act, neglect or default, and not by any contributing neglect on the part of the deceased.” The request was substantially acceded to, although not in the precise words requested. This is not necessary. The omission of the word “solely,” and the use of “ essentially,” was rendered unimportant by the concluding part of the sentence, in which, the judge stated, that there must not be amy contributing neglect on the part of the deceased. This was what the defendants’ counsel meant, when he claimed that the death must be caused “solely” by the neglect of the defendants. Strictly speaking, the language of the request was not accurate, as, if the death had been caused by the wrongful act of the defendants, in conjunction with the wrongful act of some party other than the deceased, the defendants would still have been liable. The point intended, however, was plainly, that there must be no neglect whatever on the part of the deceased. To this the defendants, I think, are entitled, and it was reasonably and fairly given in the language quoted.
*59 Two other requests were made, in relation to the negligence of the deceased, in which, I think, the judge accurately defined the law, to wit: That if the deceased, under all the circumstances of the case, in the exercise of proper care and prudence, could have seen and avoided the train, he was not entitled to recover; and that it was for the jury to determine, whether or not he exercised such care and prudence. Whether the deceased should have stopped his horse, when the train was discovered by him, or whether three seconds more of time and speed would have carried him out of danger; whether he was bound to look first in the one direction or first in the other, are questions of care and precaution, respecting which, no precise rules can be laid down, but the result is to be left to the sound judgment of the jury.
Oases of this class are before this court, at every term, and are so thoroughly discussed, and the principles so clearly settled, that I have not thought it necessary to refer to the authorities upon the subject.
Judgment should be affirmed.
Grover, James and Daniels, JJ., were for reversal on the grounds stated in the opinion of Woodruee, J. Mason and Murray, JJ., read opinions for reversal on the ground of error in the charge, as to ringing the bell. Hunt, Oh. J., for affirmance. Lott, J., not voting.
Judgment reversed and new trial ordered.

 TMs clause of the head note, is correctly quoted, but makes no complete sentence. The meaning is, perhaps, easily conjectured, but the sentence needs the words “so that” before “trains,” in order to express the sense. '—[Rep.]